UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| NORMAN BLANCO, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-1200-LJM-WTL |
| | ) | |
| THE PRUDENTIAL FINANCIAL | ) | |
| INSURANCE COMPANY OF AMERICA, | ) | |
| PRUVALUE INSURANCE BENEFITS | ) | |
| TRUST, and | ) | |
| PORSCHE ENGINEERING SERVICES, INC., | ) | |
| Defendants. | ) | |

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

This cause is now before the Court on plaintiff's, Norman Blanco ("Blanco"), Motion for

Summary Judgment on his claims against defendants, the Prudential Financial Insurance Company

of America ("Prudential"), PruValue Insurance Benefits Trust ("Trust"), and Porsche Engineering

Services, Inc. ("Porsche") (all defendants, collectively, "Defendants"), under the Employee

Retirement Income Security Act of 1974 ("ERISA").  29 U.S.C. § 101, *et seq.*  Blanco contends that

Defendants wrongfully denied him long term disability ("LTD") benefits under an employee welfare

benefit plan (the "Plan"), maintained by Porsche and underwritten by Prudential.  Defendants have

also moved for summary judgment and have moved to strike additional exhibits proffered by Blanco

that were not considered by Defendants during the administrative proceedings.

For the foregoing reasons, the Court **DENIES** Blanco's Motion for Summary Judgment;

**GRANTS** Defendants' Motion to Strike; **GRANTS** Defendants' Motion for Summary Judgment.

# I. BACKGROUND

## A. THE POLICY

The crux of the parties' argument in this case is whether Defendants' properly denied Blanco

LTD benefits because the disability he now relies upon, congestive heart failure ("CHF"), was a pre-

existing condition as that term is defined in Porsche's Group Insurance Policy No. G-3689 (the

"Policy").  The Policy provides that it "does not cover a disability due to a pre-existing condition."

PRU 193.[1]  In addition, the Policy provides, in relevant part:

> You have a pre-existing condition if both 1. and 2. are true:
>
> 1.  (a)  you received medical treatment, consultation, care or services, including diagnostic measures, or took prescribed drugs or medicines, or followed treatment recommendation in the [three] months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available; or
>
> (b)  you had symptoms for which an ordinary prudent person would have consulted a health care provider in the [three] months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available.
>
> 2.  your disability begins within [twelve] months of the date your coverage under the plan becomes effective.

PRU 104.

## B. BLANCO'S CLAIM FOR BENEFITS & PRUDENTIAL'S DENIAL

Blanco began his employment with Porsche in Troy, Michigan, on April 4, 2005.  PRU 309.

He was employed as an engineer, a light duty position, at a weekly salary of $1,711.54.  PRU 309A.

Effective May 4, 2005, Blanco became a participant of the Plan, sponsored and maintained by

---

[1]The citations to "PRU" refer to Prudential's claim file for Blanco's case, which was developed by Prudential during its review of Blanco's claim for benefits.

2

Porsche, with short term disability ("STD") and LTD benefits underwritten by Prudential.  PRU 309, 266 ¶¶ 5, 9.

On July 27, 2005, Blanco left his regular occupation and was hospitalized until August 1, 2005, and again from August 3-5, 2005, due to a myocardial infarction, progressive congestive or dilated cardiomyopathy and high-risk for sudden cardiac death.  PRU 309, 311, 307, 221.

On or about August 12, 2005, Blanco submitted a claim for STD and LTD benefits to Prudential.  PRU 307-16.  On the attending physician statement submitted along with his claim, Blanco's attending physician, Dr. Fleming, noted that Blanco was prevented from returning to work as a result of his recent myocardial infarction, severe ischemia and dilated cardiomyopathy and, apparently, coronary artery disease class III-IV.  PRU 313.  Dr. Fleming further indicated that Blanco retained sedentary work ability.  *Id.*

On August 31, 2005, Prudential approved STD benefits for a closed period until September 30, 2005.  PRU 221.  By letter of the same date, Prudential informed Blanco that his benefits were approved through September 30, 2005, and that if he wished to pursue benefits beyond that date, he needed to submit additional documentation regarding his condition and treatment by September 7, 2005.  PRU 260-61.  Blanco submitted additional records, and upon receipt of said records Prudential extended Blanco's STD benefits through Blanco's cardiac rehabilitation and to November 1, 2005, the maximum duration for STD benefits under the Plan.  PRU 223.

In addition, Prudential began evaluating Blanco's eligibility for LTD benefits as of October 19, 2005, given an LTD in-benefit date of October 25, 2005.  PRU 222.  Based on Blanco's effective date of coverage of May 4, 2005, Prudential determined that the prudent pre-existing condition exclusion would apply to the period of February 4, 2005, to May 3, 2005.  *Id.*

3

On October 17, 2005, Prudential requested Dr. Fleming's medical records. PRU 259. In addition, on October 24, 2005, Prudential requested records from Dr. Black and CVS Pharmacy. PRU 254-55.

On October 19, 2005, Prudential's Disability Claims Manager, Lorraine Cannata ("Cannata"), reviewed Blanco's medical records with Prudential's clinical team and noted that Dr. Fleming's office visit note from September 12, 2005, indicated that Blanco suffered from cardiomyopathy stage C-D, class III-IV. PRU 222. Further, Blanco's recent ejection fraction had been 15% with pulmonary hypertension and Blanco's hospital admission statement dated August 3, 2005, indicated that Blanco had a history of known cardiac disease with myocardial infarction and a stent procedure performed in 2002 at St. Vincent's Hospital in Minneapolis, Minnesota. *Id.* Cannata also noted that Blanco had a known history of hypertension and hyperlipidemia. *Id.*

Also on October 19, 2005, Cannata contacted Blanco to discuss his treatment history. PRU 236-37. Blanco admitted that he had a heart attack in 2002 and had a stent put in at that time, but reported that he stopped seeing doctors after that because every time he went to see a doctor after the heart attack, the doctors wanted to put him back in the hospital. PRU 236. Blanco claimed that he went to Dr. Black in Greencastle, Indiana, at an acute medical care facility, for an infection prior to his latest heart attack. PRU 236-37. Blanco denied receiving treatment in the relevant pre-existing condition time period. PRU 236-37. Blanco also reported that, since his latest heart attack, he was taking Lacenpril and filled the prescription at CVS in Greencastle, Indiana. PRU 237. Cannata told Blanco that she would request records that he had mentioned and asked Blanco to fill out the pre-existing condition questionnaire she had mailed the day before and return it to her. *Id.*

4

Once it had received medical information from Dr. Black's practice, Dr. Fleming, and the pharmacy records, Prudential submitted Blanco's claim for medical review by Nora Bargfrede, RN ("Bargfrede"). PRU 224-25. Bargfrede noted in her review the above-referenced conversation and listed CHF and hypertension as conditions treated with Lacenpril. PRU 224. In her review of Blanco's medical records Bargfrede also noted that on February 15, 2005, Blanco visited Dr. Black's practice, specifically, Dr. Matthew Bobzien ("Dr. Bobzien"), complaining of pain in his left testicle, which Dr. Bobzien treated with Hyrdrocodone. *Id.* In addition, at that visit, Blanco's blood pressure was 210/132, which the doctor noted was indicative of hypertensive crisis and suggested that Blanco be hospitalized. *Id.* Blanco refused hospitalization, apparently "[s]tating he had not taken his meds" that day. *Id.* From this information, Bargfrede concluded that during the pre-existing condition period, Blanco was being treated for hypertension and epididymitis. *Id.*

Bargfrede also reviewed Blanco's medical record to inform her opinion about what Blanco should have been treated for during the pre-existing condition period. PRU 224-25. In this part of her review, Bargfrede noted that on August 3, 2005, Dr. Fleming evaluated Blanco and noted that Blanco had a history of mild cardiomyopathy dating back to 1999, and that Blanco had his first non-q-wave myocardial infarction in 1999 with catheterization findings of nonobstructive disease. PRU 224. *See also* PRU 300-01. Dr. Fleming further described that Blanco progressed to significant mid-right coronary stenosis revealed through catheterization in 2002, when Blanco also had a stent placement. PRU 224. *See also* PRU 300-01. Blanco was catheterized again in September 2004 where he had evidence of progressive dilated cardiomyopathy and demonstrated an ejection fraction of only 20% with mild to moderate three-vessel disease. PRU 224. *See also* 300-01. Medical

5

management was recommended at that time by Dr. Elaine K. Moen ("Dr. Moen"), Blanco's then cardiologist.  PRU 224.  *See also* PRU 300-01.

Blanco's August 4, 2005, hospital admission note indicated that Blanco had been readmitted within the last two weeks for CHF.  PRU 224.  *See also* PRU 297-98.  Dr. Sen, who apparently wrote the hospital admission note, indicated Blanco had worsening CHF and reported that in July 2005, Blanco had demonstrated severe left ventricular dysfunction, an ejection fraction of 15%, as well as 60-70% lesion at multiple sites in a smaller-sized intermediate artery.  PRU 224.  *See also* PRU 297-98.  Blanco reported at his hospital intake that he had tachycardiac palpitations on a periodic basis but no frank syncope.  PRU 224.  *See also* PRU 297-98.

Bargfrede also considered Dr. Fleming's treatment note dated September 13, 2005, for an exam of Blanco on September 12, 2005, when Blanco presented to Dr. Fleming with regard to Blanco's cardiomyopathy and superimposed CAD.  PRU 224.  *See also* PRU 295.  At that time, Blanco's ejection fraction was severely depressed at 15% and Dr. Fleming noted Blanco's previous history of coronary intervention in 2002.  PRU 224.  *See also* PRU 295.  Dr. Fleming's impression was probable hypertensive and/or ethanol-related dilated cardiomyopathy, stage C-D, class III-IV. PRU 224.  *See also* PRU 295.

Bargfrede also examined Blanco's pharmacy records.  PRU 224-25.  She noted that, prior to the pre-existing condition period, on November 24, 2004, Blanco was on Clonidine for hypertension, Norvasc for angina and hypertension, and Lisinopril for CHF and hypertension.  PRU 224.  Bargfrede wrote that the medications were prescribed for one month, but it appeared they had not been refilled.  PRU 224-25.

Bargfrede summarized that Blanco had an extensive cardiac disease history, which included uncontrolled malignant hypertension, coronary artery disease, dilated cardiomyopathy, and previous myocardial infarction ("MI"), among other things. PRU 225. Moreover, in September 2004, Blanco was hospitalized for progressive dilated cardiomyopathy and medication management was recommended. *Id.* Bargfrede stated that "[i]t appeared that [Blanco] was on this medication regimen ([L]isinopril (CHF, HTN), Norvasc (angina, HTN), and Clonidine (HTN)[)] in [November 24, 2004]." *Id.* Bargfrede opined that "[a]lthough there is no documentation that [Blanco] had these meds refilled during the period in question, a prudent person should have been on these meds or renewed them. It is unlikely given the severity of [Blanco's] cardiac condition, that they would have been discontinued." *Id.* She further opined that on February 15, 2005, Blanco was in hypertensive crisis because he was not compliant with his medication regimen. *Id.* Bargfrede noted that Blanco had indicated that, even knowing the extent of his cardiac condition, he did not go to doctors because he was afraid they would hospitalize him. *Id.* Bargfrede concluded that "[b]ased on [the] medical information reviewed, [Blanco] should have treated for CHF, MI and cardiomyopathy." *Id.*

On November 14, 2005, Prudential denied Blanco's claim based on its determination that Blanco should have been treated during the pre-existing condition period for CHF, MI, and cardiomyopathy. PRU 226, 251-53. Prudential's notice included the following information about the appeal process:

**Right to Appeal**
You have a right to appeal this decision. If you elect to do so, your appeal must be made in writing by you or your authorized representative. Your appeal must be submitted within 180 days of the date of your receipt of this letter. Your appeal should contain:

- •     the reasons that you disagree with our determination
- •     your name, policy number and social security number (or claim number)
- •     medical evidence or documentation to support your position

Evidence or documentation may include but not be limited to such materials as:

- •     copies of therapy treatment notes
- •     any additional treatment records from physicians
- •     actual test results (e.g. EMG, MRI)

You may submit with your appeal any written comments, documents, records and any other information relating to your claim.

PRU 253.

## C.  BLANCO'S APPEAL OF PRUDENTIAL'S INITIAL DENIAL

On or about December 14, 2005, Prudential received Blanco's appeal of its previous decision.  PRU 227-28, 249, 274.  On December 23, 2005, Prudential referred the file to its clinical department requesting a file review that would respond to the following issues:

1)    Please indicate the conditions for which [Blanco] received treatment, consultation, care, services, diagnostics, or took prescribed medications between 2/4/05-5/2/05.

2)    Please indicate whether the conditions identified in #1 caused, contributed to, resulted in, or were the same conditions for which [Blanco] seeks benefits.

3)    In the alternative, given the information in the file, would an ordinarily prudent person have sought medical treatment for the conditions for which he seeks benefits between 2/4/05-5/2/05.

PRU 229.

Judy Montgomery, RN ("Montgomery"), reviewed Prudential's record on appeal.  PRU 230-32.  After reviewing Blanco's medical history, Montgomery concluded the following:

8

[Forty-five]-year-old Male Engineer, . . . with last day worked of 7/26/2005[,] with long standing history of hypertension, even though on numerous medications, not well controlled.  [Blanco] also has a history of Coronary Artery Disease as well as Congestive Heart Failure since at least 2002.

To date [Blanco] has been medically managed on the following medications:  Lipitor, Norvasc, Aspirin, Coreg, Aldactone, Nitro, Lasix, and Lisinopril for which actual start dates are not known, but medical records indicate since at least 2004.

The 2/15/05 office visit note indicates that [Blanco] was in 'hypertensive crisis - BP 210/132' and had not taken his medications that day.  Hospitalization was recommended due to this hypertensive crisis and [Blanco] refused.
NOTE: an ordinarily prudent person would  have been hospitalized in this situation based on the extensive cardiac history.

Based on the above medical records [Blanco] took prescribed medications for hypertension and congestive heart failure (Nitro) between 2/4/05-5/2/05.

[Blanco's] most recent hospitalization of 8/3/2005 was due to congestive heart failure for which was contributed to [sic], resulted from his long standing history of cardiac disease and poorly controlled hypertension.

As [Blanco] has a history of Coronary Artery Disease, Hypertension and Congestive [H]eart [F]ailure, since at least 2002, it would be reasonable that an ordinarily prudent person would have continued to have follow up visits on a regularly scheduled basis and maintained all of his prescribed medications so as to avoid deterioration to his already compromised cardiac condition.

PRU 231-32.

By letter dated December 27, 2005, Prudential notified Blanco that it was upholding its

previous determination to deny him LTD benefits.  PRU 246-48.  Specifically, Prudential explained:

On appeal, a thorough, fair, and independent review of your claim was completed. The information in your file indicates that you have a longstanding conditions [sic] related to your cardiac functioning.  Specifically, you have a history of a prior myocardial infarction (heart attack), dilated cardiomyopathy, chronic heart failure, and hypertension.  You have been prescribed a number of medications, including Nitroglycerine, Norvasc, and Lisinopril, among others.

On December 3, 2004, you were treated by your physician, Dr. Black, for what you believed to be bronchitis.  Dr. Black noted that his assessment was that you had

9

coronary artery disease and hypertension.  He also prescribed Nitrol, which is nitroglycerine, and an albuterol inhaler.

You returned to Dr. Black's office on February 15, 2005[,] complaining of pain in your testicle.  On that date, your blood pressure was 210/132.  You stated that you had forgotten to take your blood pressure medication, although you did not usually miss your medications.  Dr. Black asserted that you were in hypertensive crisis and that you should be hospitalized.  You refused to go to the hospital, reiterating that you had just forgotten to take your medications.  He warned you of the symptoms to watch for and that you should take your medication right away.

You discontinued working on July 27, 2005[,] after being hospitalized in a Detroit hospital for congestive heart failure and were catheterized at that time.  You were released and then hospitalized again on August 3, 2005[,] with further severe chest pain and you underwent lytic therapy.  Your diagnostic testing revealed that you had an ejection fraction of 15-25% with mitral regurgitation, right ventricular dilation, and elevated systolic pressure.  You were diagnosed with acute myocardial infarction and hypertension or alcohol related cardiomyopathy status post catheterization.

On October 15, 2005, you spoke with one of our representatives about your condition.  You indicated that you had not received medical care during the pre-existing time frame because following your first heart attack, whenever you went to the doctor, they would recommend that you go to the hospital.  You decided not to return to the doctor's office for that reason.

On appeal, a clinician reviewed the information in your file.  The reviewing clinician noted that an ordinarily prudent person would have followed a treating physician's recommendation to be hospitalized following your February 15, 2005[,] office visit with Dr. Black.  You were in hypertensive crisis at that time and even with extensive cardiac history, you refused Dr. Black's recommendation.  You were prescribed nitroglycerine, a medication to treat hypertension and congestive heart failure.  You have also been prescribed since at least 2004 the following cardiac medications: Norvasc, Lipitor, Aspirin, Coreg, Aldactone, Nitroglycerine, Lasix, and Lisinopril. You indicated during your February 15, 2005[,] visit that you had forgotten to take your blood pressure medication, reasonably one of those for which you had longstanding prescriptions.

As the information in your file indicates that you were 1.) treated during the pre-existing time frame for the same condition for which you are seeking benefits and 2.) that a prudent person would have sought further treatment as recommended by Dr. Black during that time frame, your cardiac conditions are excluded from coverage under the provisions of the long-term disability policy.  As such, no long-term disability benefits are payable on your claim.

* * *

You may again appeal this decision to Prudential's Appeals Review Unit for a final decision.  If you elect to do so, the appeal must be made in writing by you or your authorized representative.  Your complete appeal must be submitted within 180 days of the receipt of this letter.  The appeal may identify the issues and provide other comments or additional evidence you wish considered.  You are entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records and other information relevant to your claim. . . .

* * *

Please note that this second appeal is voluntary. . . .

Since you have now completed the first level of appeal, you may file a lawsuit under [ERISA]. . . .  Your decision on whether to file a second appeal will not affect your right to sue under ERISA.

PRU 247-48.

On August 8, 2006, Blanco filed the instant suit.  PRU 263-269


### D.  ADDITIONAL EVIDENCE BLANCO PRESENTS IN THIS SUIT

Instead of relying upon the record before Prudential at the time it made its decision, Blanco submits new records in support of this lawsuit.[2]  Defendants have moved to strike these materials. To facilitate the Court's discussion of Defendant's Motion to Strike, the Court will outline Blanco's additional evidence here.

Dr. Bobzein, Blanco's treating physician at his February 15, 2005, visit to Dr. Black's practice, attests that on that date, he treated Blanco only for testicular pain and hypertension. Bobzein Aff. ¶ 4.  According to Dr. Bobzein, he and Blanco did not discuss symptoms or treatment

---

[2]The Court notes that it appears that Blanco's Exhibits 1-7 were part of Prudential's administrative record, therefore, the Court will not address those exhibits in this section.

related to congestive heart failure, myocardial infarction or other heart conditions. *Id.* Rather, Dr. Bobzein discussed treatment options to manage Blanco's high blood pressure, including hospitalization. Bobzein Aff. ¶ 5. Dr. Bobzein attests that he did not suggest that hospitalization was Blanco's only reasonable treatment option; Dr. Bobzein discussed medical management of Blanco's hypertension with prescribed medication. *Id.* Dr. Bobzein states that he did not diagnose or treat Blanco for congestive heart failure or other cardiac conditions during his visit on February 15, 2005, and "[hypertension is not a specific symptom of a cardiac condition, such as congestive heart failure or myocardial infarction." Bobzein Aff. ¶ 6. Dr. Bobzein also attests that "Lisinopril, Norvasc, and Clonidine are frequently used alone or in combination to treat hypertension, although they may also be prescribed to help in the treatment of other ailments including various heart conditions." Bobzein Aff. ¶ 7.

Dr. Fleming attests that in August 2005, he examined Blanco and diagnosed that Blanco has CHF. Fleming Aff. ¶ 4. Dr. Fleming states that Blanco is under his care as of the date of the affidavit. *Id.* Dr. Fleming asserts that in September 2005, Blanco's functional capacity was substantially limited and, thus, Dr. Fleming recommended that he not return to work. Fleming Aff. ¶ 5. Dr. Fleming opines that Blanco's functional capacity continues to be substantially limited, and Blanco is disabled by CHF and cannot perform substantive or material tasks required by his regular occupation. Fleming Aff. ¶ 6.

Dr. Black attests that Blanco sought treatment for bronchitis on December 3, 2004. Black Aff. ¶ 5. At that visit, Blanco did not have symptoms of congestive heart failure or myocardial infarction. *Id.* Dr. Black asserts that "[i]t is normal to consider Nitrol as part of a treatment plan for former heart attack victims to sue for chest discomfort as necessary." Fleming Aff. ¶ 6. Similarly

12

to Dr. Bobzien's attestation, Dr. Fleming further states that "Lisinopril, Norvasc, and Clonidine are frequently used alone or in combination to treat hypertension, although they may also be prescribed to help in the treatment of other ailments including various heart conditions."  Fleming Aff. ¶ 7.

Blanco attests that the first time that he was diagnosed with congestive heart failure was on July 27, 2005, when he sought medical attention for shortness of breath and chest discomfort. Blanco Aff. ¶ 5.

## II. STANDARDS

### A. SUMMARY JUDGMENT

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990).  Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury

to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir. 1996).  It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which she relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996).  When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322-23; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir. 1996).  The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment.  Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir. 1996).  Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).  "If the nonmoving party fails to establish the existence of an element essential to his case, one on which he would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir. 1996).

## B. ERISA REVIEW

The Court agrees with the parties that a *de novo* standard applies to the Court's review of this case. Under the *de novo* standard of review, the Court must look to the terms of the policy and determine, from an independent review of the record, whether Blanco established that he was entitled to benefits thereunder. *See Diaz v. Prudential Ins. Co. of Am.*, 499 F.3d 640, 643 (7th Cir. 2007) (citing *Wilczynski v. Kemper Nat'l Ins. Cos.*, 178 F.3d 933, 934-35 (7th Cir. 1999)) (on re-appeal, reversing grant of summary judgment and remanding for trial).

## III. DISCUSSION

As a preliminary matter, Prudential asserts that the Court should strike the extraneous materials Blanco submitted with his Motion for Summary Judgment because Blanco has failed to show good cause why the Court needs to consider them in its *de novo* review of its decision to deny Blanco LTD benefits. Blanco contends that the sworn testimony from his treating physicians is clearly admissible under the Seventh Circuit's standard articulated in *Patton v. MFS/Sun Life Financial Distributors, Inc.*, 480 F.3d 478 (7th Cir. 2007).

Under the *de novo* standard of review, the Court has "discretion to 'limit the evidence to the record before the plan administrator, or . . . [to] permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment.'" *Id.* at 490 (quoting *Casey v. Uddehom Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993)). The *Patton* court explained that, in addition to the factor enunciated by the rule itself, a court should also "consider whether the evidence sought to be introduced would concern plan terms or historical facts concerning the claimant, whether the plan

15

administrator faced a conflict of interest and, . . . whether the parties had a chance to present their evidence in the ERISA administrative proceeding." *Id.* at 491 (citing *Quesinberry*, 987 F.2d at 1027). No factor is determinative, but the Court must "provide a reasonable explanation for its decision . . . ." *Id.*

Under the circumstances here, the Court is persuaded that the record is complete enough for the Court to make an informed an independent judgment. Prudential sought all relevant medical records as they were either independently identified or as they were identified through Prudential's conversation with Blanco. PRU 236-37, 254-59, 277-306. Moreover, despite Prudential's repeated attempts to get clarification of the medical record from Blanco's doctors, the doctors never responded to Prudential's calls. PRU 237-38.

Furthermore, Prudential's initial denial letter made it clear that the pre-existing condition clause formed the basis of its denial to award Blanco LTD benefits. PRU 251-53. As a result, Blanco was on notice that his treating physicians' views of his health was tantamount to an appeal outcome in his favor. Yet, Blanco submitted no further information for Prudential's review. Having had the opportunity to present his doctors' affidavits at the appeals stage, the Court is reluctant to turn the administrative appeal process into a mere conduit for *de novo* review by a Federal District Court on a different record.

The Court is equally unpersuaded by Blanco's arguments that Prudential had a conflict of interest because it used in-house clinical and medical review staff to evaluate Blanco's claim or because the same company both administers and pays for the benefits. The Seventh Circuit has held irrelevant the distinction between an insurance company's use of in-house medical personal to perform independent review of medical records. *See Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d

16

569, 575 (7th Cir. 2006).  Likewise, the Seventh Circuit has expressly rejected the argument that a conflict of interest exists where an insurer both administers and pays the benefits.  *See Leipzig v. AIG Life Ins. Co.*, 362 F.3d 406, 408 (7th Cir. 2004).

Moreover, the fact that the medical personnel that Prudential used to review Blanco's records were not doctors is not indicative of malfeasance.  There is no rule that requires an independent review at all, much less that the review be performed by a doctor rather than a nurse.  *Accord Sperandeo v. Lorillard Tobacco Co.*, 460 F.3d 866, 876 n.9 (7th Cir. 2006) (discussing *Wallace v. Reliance Std. Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003)).  Neither is there a requirement that a plan administrator give deference to the opinions of treating physicians.  *See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).

Having balanced all of the factors set forth in *Patton*, in its discretion the Court concludes that Blanco's evidence is inadmissible to supplement administrative record because it is not necessary to enable the Court to make its own informed and independent judgment.  Prudential's Motion to Strike is **GRANTED**.

Turning now to a review Blanco's claim in light of the administrative record, the Court concludes that Prudential properly applied the pre-existing condition exclusion when it denied Blanco's claim for LTD benefits.  The Court starts with the pre-existing condition language of the Policy and the basis of Blanco's claim.  The Policy states that it "does not cover a disability due to a pre-existing condition," PRU 193, and:

You have a pre-existing condition if both 1. and 2. are true:

1.    (a)    you received medical treatment, consultation, care or services, including diagnostic measures, or took prescribed drugs or medicines, or followed treatment recommendation in the [three] months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available; or

(b)    you had symptoms for which an ordinary prudent person would have consulted a health care provider in the [three] months just prior to your effective date of coverage or the date an increase in benefits would otherwise be available.

2.    your disability begins within [twelve] months of the date your coverage under the plan becomes effective.

PRU 104.

On his application for benefits, Blanco claimed that the medical condition that prevented him from working was his heart; he also referenced his doctors' reports.  PRU 315.  Those reports indicated that Blanco had recently had a heart attack, that the clinical diagnosis was "Primary: Acute Myocardial Infarction . . . Secondary: dilated [c]ardiomyopathy . . . Secondary: CHF . . .", that the obstacles to returning to work were "CHF/potential for heart arrhythmia," and that the nature of Blanco's medical impairment and/or limitation was "severe [i]schemic/dilated cardiomyopathy, C[unintellible] class III-IV."  PRU 311-13.

There is really no dispute that given Blanco's effective date of coverage of May 4, 2005, Prudential correctly determined that the relevant pre-existing condition exclusion period was February 4, 2005, to May 3, 2005.  PRU 222.  Therefore, according to the Policy, Blanco's claim for LTD benefits would be denied if his disability was "due to" a pre-existing condition, as the Policy defines that term, within that time frame.

Blanco contends that Prudential erred when it denied him LTD benefits based on a diagnosis of hypertension in the pre-existing condition limitations period because the condition for which he seeks LTD benefits is CHF, a completely different diagnosis.  Blanco asserts that the first time he

was ever diagnosed with CHF was on July 27, 2005, when he went to the hospital to be treated for chest pains.  Moreover, Blanco argues that the prescriptions for Lisinopril, Norvasc, and Clonidine in November 2004, were not prescribed to treat CHF; rather, they were used to treat Blanco's hypertension.   Blanco states that Prudential erred when it equated Blanco's treatment for hypertension with treatment for CHF.  Blanco avers that the fact that he had a heart attack in 1999 or in 2005, or that he had problems with hypertension and does not like being in hospitals is not proof that he should have sought treatment for CHF, a condition for which he did not have symptoms during the relevant pre-existing condition period.  Blanco also contends that he is entitled to all of his LTD benefits from this Court because he has exhausted his administrative remedies.

The Court agrees with Prudential that Blanco's reliance on CHF alone ignores that his claim for benefits identified that his disabilities stemmed from his recent myocardial infarction, severe ischemia and dilated cardiomyopathy, and, apparently, cardiac artery disease class III to IV, as well as CHF.  Likewise, Blanco ignores the fact that he had been treated in September 2004 by a cardiologist who suggested that his various heart conditions needed medical management, but Blanco provides no evidence that he followed any doctor's advice about medication or medical management except for filling prescriptions in December 2004, and again in February 2005 after his visit to Dr. Bobzien.  PRU 301, 292.  He also ignores that at his visit to Dr. Bobzien in February 2005 his blood pressure was dangerously high because of his hypertension.  PRU 284.  References to CHF appear in the admission notes for his heart attack when Dr. Sen noted that Blanco had "a background of severe congestive heart failure" that was "worsening . . . ."[3]  PRU 298.  But, his

_____

[3]The Court notes that his treating cardiologist, Dr. Fleming, in the treatment notes for August 29, 2005, suggests that at that time there was no CHF.  PRU 301.  Dr. Fleming filled out Blanco's claim form.  PRU 311-13.

treating physician's notes for his heart attack clearly stated that "patient likely has background hypertensive cardiomyopathy." PRU 303. *See also* PRU 295 (Dr. Fleming's treatment notes for September 2005 indicating that Blanco's cardiomyopathy was due to hypertension). Moreover, Dr. Fleming's discharge diagnosis for Blanco's hospitalization for his heart attack in early August 2005, indicated first the acute myocardial infarction and second "[d]ilated cardiomyopathy, hypertensive and/or ethanol related per history." PRU 300. Therefore, the connection between his hypertension and his claimed disability due to his heart conditions is clearly supported by the medical evidence in the record.

Blanco's reliance on *Pitcher v. Principal Mutual Life Insurance Co.*, 93 F.3d 407 (7th Cir. 1996), for a different outcome is misplaced. In *Pitcher*, the plaintiff claimed that her insurer had wrongfully denied her disability benefits due to her breast cancer under the pre-existing condition exclusion of her policy.[4] *Id.* at 410. The *Pitcher* plaintiff argued that in the pre-existing condition period she received treatment for fibrocystic breast disease, not for breast cancer, therefore, the exclusionary clause in her policy did not apply. *Id.* at 409-10. Both the district court and the Seventh Circuit agreed with the *Pitcher* plaintiff that because all of the treatment she received during the exclusionary period was based on the diagnosis of fibrocystic breast disease, including diagnostic procedures performed before the breast cancer diagnosis, the *Pitcher* plaintiff had not received "treatment or service" for breast cancer during the exclusionary period. *Id.* at 410-11, 417.

*Pitcher* is distinguishable from the facts of the instant case. First, Blanco's assertion that CHF and his history of chronic heart disease and hypertension have no relation is belied by his

---

[4]The Court notes that the policy language in *Pitcher* did not include exclusions for diagnostic procedures, rather its exclusions were based on "treatment or service," which is slightly different from the policy language at issue in this case. *Pitcher*, 93 F.3d at 412.

doctors' own treatment notes as discussed above.  According to Dr. Fleming, Blanco's disabling condition was much broader than CHF.  PRU 313.  In fact, Dr. Fleming's treatment notes indicate in several places that Blanco's cardiomyopathy, or disease of the heart muscle,[5] was due to hypertension.  PRU 295, 300, 303.  Moreover, unlike in *Pitcher* where the non-life-threatening fibrocystic breast disease was materially different from and unassociated with the life-threatening breast cancer, Blanco's heart disease had been manifesting itself in various forms for over six years prior to the spring of 2005.  Furthermore, in February 2005, Blanco received treatment from Dr. Bobzien for hypertension, albeit, not hospitalization, which it appeared that Dr. Bobzien seemed to think would have been the best course.  PRU 284.

A reasonable fact finder could not find persuasive Blanco's attempt to cast this visit to his doctor as focused solely on his testicular pain and therefore not treatment for his chronic hypertension.[6]  First, Dr. Bobzien identified Blanco's hypertension as the first item he discussed with Blanco, which indicates the importance of Blanco's hypertensive crisis on that date.  PRU 284.  Second, Blanco filled his cardiac prescriptions just after his visit to Dr. Bobzien.  PRU 292.  The problem for Blanco is that there is no record that he ever continued treatment for his cardiac conditions.  Rather, the record evidence suggests that after being advised to medically manage his cardiomyopathy in September 2004, Blanco filled a one-month prescription in December 2004,

---

[5]Cardiomyopathy is defined:  "Disease of the myocardium."  STEDMAN'S MED. DICTIONARY 282 (Williams & Wilkins 26th Ed. 1995).  Myocardium is defined:  "The middle layer of the heart, consisting of cardiac muscle."  *Id.* at 1167.  The Court notes that Stedman's lists CHF as a primary cardiomyopathy.  *Id.* at 282.

[6]The Court notes that even if it had considered the affidavits Blanco submitted with his Motion for Summary Judgment, the only reasonable conclusion is that Blanco avoided treatment for his long-standing cardiomyopathy during the pre-existing condition time period, which is contrary to what a prudent person would have done under the same circumstances.

21

another one-month prescription in February 2005, but never refilled any of his medications to manage his heart disease in-between December 2004 and February 2005, or after February 2005, until his heart attack in August 2005.  PRU 301, 290-93.

These facts also illustrate the second difference between this case and *Pitcher*.  In *Pitcher* there is no mention of a prudent person clause or its application to the facts of that case.  Blanco's policy included such a clause.  Having received advice in September 2004 to have his heart disease medically managed, Blanco provides no evidence from which a fact finder could conclude that he followed the medical management regime after filling his prescriptions in December 2004.  By February 15, 2005, Blanco was in hypertensive crisis and admitted that he had not taken his medication.  PRU 284.  After February 2005 and through the pre-existing condition period of May 3, 2005, a reasonable fact finder could only conclude that an ordinarily prudent person would have been receiving ongoing medical treatment for heart disease given the September 2004 diagnosis and continued manifestations of hypertensive cardiomyopathy in February 2005.  There is no evidence that Blanco attempted to continue the course of treatment outlined by Dr. Bobzien.  In fact, Blanco admitted to Prudential that he did not seek medical help after his first heart attack because he did not like hospitals.  PRU 236.  The Court recognizes that no patient likes hospitals; however, purposeful avoidance of treatment cannot revive an otherwise contractually prohibited claim.

For these reasons, the Court concludes that a reasonable fact finder could only conclude that Prudential correctly determined that the pre-existing condition exclusion applied to Blanco's claim for LTD benefits.  Prudential's Motion for Summary Judgment is **GRANTED**; Blanco's Motion for Summary Judgment is **DENIED**.

# IV.  CONCLUSION

For the reasons stated herein, the Court **DENIES** plaintiff's, Norman Blanco, Motion for Summary Judgment; **GRANTS** both Defendants', the Prudential Financial Insurance Company of America, PruValue Insurance Benefits Trust, and Porsche Engineering Services, Inc., Motion to Strike and Defendants' Motion for Summary Judgment.

IT IS SO ORDERED this 31st day of March, 2008.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Distributed electronically to:

George M. Plews
PLEWS SHADLEY RACHER & BRAUN
gplews@psrb.com

Ruth M. Rivera Morales
PLEWS SHADLEY RACHER & BRAUN
rrivera@psrb.com

Edna Sybil Bailey
WILSON ELSER MOSKOWITZ EDELMAN & DICKER
edna.bailey@wilsonelser.com

Daniel John McMahon
WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
mcmahond@wemed.com